IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CRYSTAL Y. JAMES, | ) | CASE NO. 5:16CV2040 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Crystal James ("James") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

James filed applications for DIB and SSI on February 19, 2013, alleging a disability onset date of January 2, 2008.  Tr. 18, 202, 206.  She alleged disability based on the following: chronic leg and knee pain, difficulty breathing, body pain, sleep apnea, chronic headaches, and high blood pressure.  Tr. 227.  After denials by the state agency initially (Tr. 96, 97) and on reconsideration (Tr. 126, 127), James requested an administrative hearing.  Tr. 152.  A hearing was held before Administrative Law Judge Gregory M. Beatty ("ALJ") on June 23, 2015.  Tr.

36-73.  In his July 7, 2015, decision (Tr. 18-29), the ALJ determined that there are jobs that exist

in significant numbers in the national economy that James can perform, i.e., she is not disabled.

Tr. 28.  James requested review of the ALJ's decision by the Appeals Council (Tr. 14) and, on

June 20, 2016, the Appeals Council denied review, making the ALJ's decision the final decision

of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

James was born in 1965 and was 47 years old when her applications were filed.  Tr. 202.

She graduated from high school and attended 3 ½ years of college.  Tr. 42.  She last worked at a

women's halfway house where she monitored the residents and, before that, at Goodyear Tire

and Rubber Company, through a temporary agency, where she conducted market research

interviews and was a customer service representative in the tire and auto complaints department.

Tr. 42, 44-45.

### B.  Relevant Medical Evidence

Physical evidence:  On February 13, 2009, James went to the emergency room

complaining of pain in her right knee after falling at work.  Tr. 493.  Upon examination, her knee

was objectively normal and x-rays showed no acute fracture or effusion.  Tr. 495.

On March 9, 2011, James had a polysomnogram that showed severe upper obstructive

sleep apnea which significantly worsened during REM sleep in the supine position with

associated profound hypoxia.  Tr. 434.  She was fitted with a CPAP machine and it was

recommended that she lose weight.  Tr. 434.  At the time, she weighed 194 pounds.  Tr. 434.

On March 27, 2012, James visited the Internal Medicine Center of Akron complaining of

joint pain and chronic shortness of breath.  Tr. 379.  She reported left knee pain that was not

controlled with Aleve and Naproxen.  Tr. 379.  She also was morbidly obese and stated that she performed brisk walking daily and ate a low-fat diet.  Tr. 379.  She no longer had a car and was therefore walking.  Tr. 380.  Upon exam, she weighed 282 pounds.  Tr. 380.  She had a normal gait and knee exam.  Tr. 380.  She was prescribed Mobic for her knee pain and it was noted that she needed a CPAP machine.  Tr. 381.  A social worker helped her restart the process for getting a CPAP machine as James had previously received, but had not filled out, the required paperwork.  Tr. 378.

On July 19, 2012, James returned for a follow up visit for her arm and leg pain.  Tr. 375.  She reported chronic, burning pain on her left side (her arm, her leg, back) for a year and a half.  Tr. 375.  She could not raise her left arm above her shoulder.  Tr. 375.  She felt tired, hopeless, and had not been using a CPAP machine, although she stated that she had been approved for one.  Tr. 375.  She reported doing aerobic exercises 2-3 days per week and stated that she had quit her last job after she had been robbed there.  Tr. 376.  Upon examination, she had mild ankle edema and a decreased range of motion in her shoulder.  Tr. 377.  A left shoulder x-ray was normal.  Tr. 400.

On August 31, 2012, James returned complaining of pain in both knees.  Tr. 366.  Upon exam, her gait was normal.  Tr. 367.  She had shoulder tenderness but normal range of motion, and no elbow tenderness but abnormal elbow range of motion.  Tr. 367.  Her hips and ankles were normal but she had tenderness and decreased range of motion in her knees.  Tr. 367.  She weighed 284 pounds.  Tr. 367.

On October 2, 2012, James returned with a headache and sinus infection.  Tr. 359.  Upon exam, her gait was normal and she had no leg edema.  Tr. 359.  She weighed 289 pounds and her body max index (BMI) was 50.7.  Tr. 359.  She was advised to lose weight.  Tr. 360.

On January 29, 2013, James returned for a follow up visit.  Tr. 346.  She had gotten her CPAP machine 2 weeks prior.  Tr. 346.  She complained of bilateral leg pain.  Tr. 347.  Her weight was 290 pounds (BMI 50.9).  Tr. 347.  Upon exam, she had a normal gait, normal shoulders and elbows and normal hips, knees and ankles.  Tr. 347.  She was advised to cut down on sugar, perform aerobic exercises at least three days a week, and to make an effort to lose weight.  Tr. 348.

A lumbar MRI taken on March 22, 2013, was normal.  Tr. 410.

On December 27, 2013, James complained that she had fallen one week prior and had hurt her left hip and that she had a sinus infection.  Tr. 701.  Her hip pain was initially "pretty bad" but was currently manageable with Aleve.  Tr. 701.  She weighed 304 pounds (BMI 54.2).  Tr. 702.  Upon exam, she had no hip tenderness or abnormal range of motion, but she did have tenderness and abnormal range of motion in her knees.  Tr. 702.

James returned on January 7, 2014, still reporting hip pain as well as left knee and back pain.  Tr. 696.  Upon exam, she had an abnormal gait, left lumbar paraspinal tenderness upon palpation, and left knee tenderness and reduced range of motion.  Tr. 697-698.  X-rays of her left hip taken January 17, 2014, were normal.  Tr. 653.

On February 25, 2014, James reported pain in her left knee after falling on it when she got off the bus four days prior.  Tr. 690.  She also complained of back pain.  Tr. 690.  Upon examination, her back was stiff and she had a reduced range of motion.  Tr. 690.  Her left knee was stiff and her ability to bear weight was poor.  Tr. 691.  She had decreased flexion and extension.  Tr. 693.  She was able to straighten her left knee and get onto the examination table without any problem.  Tr. 691, 693.  She had no swelling in either knee and examination of her right knee was normal.  Tr. 693.  She had abnormal left straight leg raise testing.  Tr. 693.  She

had lost five pounds and stated that it was difficult for her to lose weight; she was advised on dietary strategies such as keeping a food log and educated on stretches for her sacroiliac joint. Tr. 694.  She was referred to physical therapy for her knee and back pain.  Tr. 694.

A lumbar spine x-ray taken on March 12, 2014, showed some degenerative changes at L4-L5 and L5-S1 facet joint bilaterally but the disc spaces were well-preserved and James's spine was otherwise normal.  Tr. 652.  Her knee x-rays revealed prominent degenerative changes in both knees which were significantly more advanced than her previous x-rays.  Tr. 732.

On April 1, 2014, James complained of right ankle swelling present for two weeks.  Tr. 684.  She was currently in physical therapy for her left knee and did not have any acute issues that day with her knee.  Tr. 684.  She reported that she could walk and stand for about an hour on her ankle and then needed to sit and rest.  Tr. 684.  When she walked the swelling got worse.  Tr. 684.  NSAIDs and Mobic provided mild relief.  Tr. 684.  She weighed 298 pounds and her BMI was 52.8.  Tr. 685.  Upon exam, she had mild edema in both ankles and pain with range of motion.  Tr. 686.  An x-ray of her right ankle was negative.  Tr. 651.  She was referred to physical therapy.  Tr. 686.

James attended 25 physical therapy appointments from March 3 through September 2, 2014.  Tr. 718, 939.  She was discharged to a home exercise program and aquatic therapy.  Tr. 939.  She reported decreased pain at discharge.  Tr. 939.

On August 26, 2014, James complained that she needed to get her pain under control.  Tr. 751.  Her treatment note reads, "Morbid Obesity: is developing multiple complication[s] such as Hypoventilation, [osteoarthritis] of multiple joint[s]."  Tr. 751.  Upon exam, she had normal posture, an abnormal gait, neck stiffness and tenderness, back stiffness and lumbar spine tenderness with an abnormal range of motion, restricted joint movements, shoulder tenderness

and abnormal range of motion, and ankle and knee tenderness and abnormal ranges of motion. Tr. 754.  She was assessed with the following chronic, uncontrolled problems: polyarthropathy, depression, low back pain, and extreme obesity with alveolar hypoventilation.  Tr. 754.  Her hypertension and obstructive sleep apnea were controlled.  Tr. 754.  She was restarted on Naproxen, continued on Tylenol, and referred to a dietician.  Tr. 754.

James attended physical therapy again in September through November 2014.  Tr. 823. Upon assessment on September 17, she had fair posture, an abnormal gait, and weakness in her left shoulder and bilateral legs.  Tr. 814.  She had full range of motion in her lumbar spine but with pain.  Tr. 814.

On February 13, 2015, James reported that she had been in a bus accident when a truck hit the bus she was riding in.  Tr. 944.  As a result of the accident, she had lower back pain and left shoulder pain.  Tr. 944.  She relayed that she had done physical therapy for her knee, which had been helpful, and wanted a referral to complete the course.  Tr. 946.  She weighed 288 pounds and her BMI was 51.01.  Tr. 945.  Upon exam, she had edema in her legs and pain with movement in her left knee especially when weight bearing.  Tr. 945.  She was not willing to consider bariatric surgery for weight loss.  Tr. 946.  She was prescribed additional physical therapy.  Tr. 946.

On April 10, 2015, James asked to be referred for pain management for "all over body pain that doesn't get better."  Tr. 941.  She reported that she had had water therapy and seen a chiropractor, which had both helped in the past.  Tr. 941.  Upon exam, she had trace pedal edema and full range of motion, but with complaints of pain.  Tr. 941.  She was referred to pain management and a chiropractor.  Tr. 942.

A lumbar x-ray taken on May 4, 2015, was within normal limits, with well-preserved disc spaces.  Tr. 890.

Mental evidence: On November 8, 2013, James began counseling sessions at Portage Path Behavioral Health.  Tr. 645.  She discussed her anger and resentment about church and people (Tr. 641), her physical problems and that she had stayed in bed on Thanksgiving Day (Tr. 643), and that she was disappointed with friends and people (Tr. 645).  On December 19, 2013, James was evaluated.  Tr. 637.  She reported being depressed and having anxiety attacks.  Tr. 637.  She denied any psychotic symptoms.  Tr. 637.  She was diagnosed with Depressive Disorder NOS and Posttraumatic Stress Disorder and prescribed Zoloft.  Tr.  638-639.

On January 21, 2014, James reported that she had run out of her Zoloft "a long time ago." Tr. 634.  She re-started her medication on February 7, 2014.  Tr. 679.  She ran out again in April. Tr. 666.  She reported that she had felt less depressed and her mood had improved when she took her medication as prescribed and would like to restart it.  Tr. 666.

On August 26, 2014, James told her counselor at Portage Path that she had helped out at a conference and cooked meals three days prior to her visit.  Tr. 779.  She had had a bad day the day before her visit and could not move at all due to pain.  Tr. 779.  She reported that she had had a bad month: her mother passed away two days prior, her oven, washer and refrigerator broke, and she got a water shut-off notice.  Tr. 779.  The treatment note reads, "She was able to take care of her problems."  Tr. 779.  Later the same day, at a visit with her doctor at the Internal Medicine Center of Akron, James reported being anxious and depressed and having mood swings.  Tr. 753.  The treatment note reads, "[Patient] is having mild to moderate depression on meds."  Tr. 753.  Two days later, James told a provider at Portage Path that she had been out of

her Zoloft for about a month.  Tr. 777.  She reiterated that, when she took Zoloft regularly, it was

helpful.  Tr. 777.  She was instructed on the importance of medication compliance.  Tr. 778.

On October 14, 2014, a treatment note from Portage Path indicates that, upon exam,

James had or reported a cognitive impairment with attention, concentration, and memory.  Tr.

773.

On March 16, 2015, James stated that she was having family-related stressors and had

had "high symptoms" of depression and anxiety for about a week.  Tr. 796.  She indicated that

she was forced to stop physical therapy for her back because the truck driver that hit the bus she

was on did not have insurance, and that the therapy had helped her back pain.  Tr. 796.

During her counseling sessions at Portage Path, James was observed to have either a

depressed and/or anxious mood.  *See, e.g*., Tr. 773, 775, 777, 779, 782, 784, 788, 790, 793, 796,

798, 800.

### C.  Medical Opinion Evidence

### 1. Treating Physician

<u>Physical</u>: Some time after March 2013, an unidentified individual at the Internal

Medicine Center of Akron completed an unsigned and undated assessment.  Tr. 338-339.  He or

she related that James was first seen at the Center in March 2012; she had complained of

multiple joint pain since June 2010; rheumatoid factors and other causes had been ruled out; she

had been given Naproxen; her gait had been normal and she had had no joint laxity, no decreased

muscle tone and no joint swelling; and she had had an abnormal range of motion in her left

shoulder but that an x-ray was normal.  Tr. 338.  She had been on Mobic, which did not work,

and Tramadol, which she had "just started" on March 5, 2013.  Tr. 339.  She had been unable to

receive physical or occupational therapy because of financial constraints; she was advised to lose

weight but was unable to perform her exercises; and she had been diagnosed with morbid

obesity, chronic sleep apnea, and chronic pain syndrome.  Tr. 338-339.  In the individual's

opinion, James "can only tolerate to move & able to function up to three hours.  After that, she's

not able to perform work due to pain."  Tr. 339.

Mental: On January 23, 2014, James's counselor at Portage Path, Tomoko Sherrod,

completed a medical source assessment (mental) form.  Tr. 647-648.  Sherrod opined that James

would be able to perform (but would have noticeable difficulty more than 20% of the workday or

workweek) the tasks of understanding and remembering very short and simple instructions and

carrying out very short and simple instructions.  Tr. 647.  However, she would have *less*

difficulty understanding, remembering, and carrying out *detailed* instructions.  Tr. 647.  James

would also have noticeable difficulty more than 20% of the work day or workweek with the

following: sustaining an ordinary routine without special supervision, being aware of normal

hazards and taking appropriate precautions, and setting realistic goals or making plans

independently of others.  Tr. 647-648.  But she would have no limit in her ability to complete a

normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr.

647.  She would also miss more than four days of work per month as a result of her impairments.

Tr. 647.  Sherrod explained, "Ct reports her depression is overwhelming daily along with her

multiple medical condition[s].  Ct reports she tends to isolate herself due to depression.  Ct

verbalizes poor sleep, irritability, [decreased] daily activities, [decreased] motivation."  Tr. 648.

### 2. Consultative Examiner

Physical: On May 28, 2013, James saw Maren Gaul, D.O., for a consultative

examination.  Tr. 502-504.  James complained of left-sided pain that has gotten worse over the

years since she had gained weight, bilateral knee pain (left worse than right), bilateral ankle pain,

and left foot pain.  Tr. 502.  She also reported that, due to her asthma, she could not run because

she got short of breath.  Tr. 502.  She stated that she was fired from her last job because she had

left during her lunch hour, but that she could perform this type of work again except that it would

need to be more sedentary and she could not go up or down steps.  Tr. 502.  Her house had 6

steps up to the porch and 12 steps inside, which she had difficulty with.  Tr. 503.  She reported

that she can walk for 15 minutes without discomfort and stand for 30 minutes, but she could not

sit at all without being uncomfortable.  Tr. 503.  Dr. Gaul wrote, "She didn't seem to be in

extreme pain during exam and interview."  Tr. 503.  James reported being able to bathe, cook

and clean, although sometimes she had difficulty cleaning because of pain.  Tr. 503.  She could

lift "probably" 20 pounds.  Tr. 503.

Upon exam, James's BMI was 54.  Tr. 503.  She had no edema in her extremities, good

range of motion and full strength bilaterally in her arms and legs, and a good range of motion in

her spine.  Tr. 503.  Dr. Gaul performed manual muscle testing as well as range of motion

testing.  Tr. 505-508.  Dr. Gaul marked "normal" as to James's shoulder, elbows, wrists, hips,

knees, and feet.  Tr. 505.  She had normal grasp, manipulation, pinch, and fine coordination.  Tr.

505.  She also had normal range of motion in her cervical spine and in the flexion, extension,

abduction, adduction, and internal and external rotation of her shoulders.  Tr. 506.  Testing of her

dorsolumbar spine was normal.  Tr. 507.  Testing of her hips, knees, and ankles was normal.  Tr.

508.  Dr. Gaul assessed James with left sided chronic pain with knee pain and osteoarthritis and

asthma.  Tr. 503.  She opined that James had "chronic pain and asthma, likely exacerbated by her

weight, which has caused hypertension and sleep apnea."  Tr. 508.  James should lose weight and

be more active; activity would help with all her issues.  Tr. 508.  "Regarding her ability to work,

10

she would be able to do any job that would be mostly sedentary but she would be able to get up and move around and do things as needed between hours of sitting."  Tr. 504.

Mental: On January 6, 2014, James saw psychologist Judith Rosenthal, Ph.D., for a mental consultative examination.  Tr. 627-631.  She reported that she had been depressed for the past five to six years.  Tr. 627.  She had fallen in 2009 and had had memory problems since that time.  Tr. 628.  She had just started counseling and medications for her depression 2 ½ months prior.  Tr. 631.  Dr. Rosenthal diagnosed James with depressive disorder and anxiety disorder, both mild to moderate.  Tr. 630.  She opined that James had no significant limitations in understanding, remembering, and carrying out instructions in a work environment, maintaining attention and concentration, interacting with others, or handling stress and pressure in the workplace, and that James's work history indicated no significant interpersonal limitations.  Tr. 630- 631.

### 3. State Agency Reviewers

Physical: On July 19, 2013, state agency reviewing physician Lynne Torello, M.D., reviewed James's record.  Tr. 90.  Regarding James's residual functional capacity ("RFC"), Dr. Torello opined that James could perform light work, i.e., stand and/or walk for six hours in an eight-hour workday and sit for about six hours in an eight-hour workday, occasionally lift 20 pounds and frequently lift 10 pounds.  Tr. 91.  She also found that James could occasionally climb ramps, stairs, ladders, ropes, or scaffolds and could occasionally balance, stoop, kneel, crouch, and crawl.  Tr. 91.  She would need to avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation and had no other environmental hazards.  Tr. 92.

On January 17, 2014, Anne Prosperi, D.O., reviewed James's record and adopted Dr. Torello's opinion that James could occasionally lift 20 pounds and frequently lift 10 pounds, but

found James limited to standing and/or walking for four hours in an eight-hour workday and sitting for six hours in an eight-hour workday.  Tr. 120-121.  Dr. Prosperi opined that James could never climb ladders, ropes, or scaffolds, and could occasionally climb ramps and stairs and balance, kneel, crawl, crouch, stoop.  Tr. 121.  She also opined that James should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.  Tr. 122.

Mental: On January 15, 2014, state agency psychologist Irma Johnston, Psy.D., reviewed James's record.  Tr. 104-105.  Regarding James's RFC, Dr. Johnston opined that James was mildly limited in activities of daily living, social functioning and concentration, persistence and pace, and opined, "psych impairments are not severe."  Tr. 105, 119.

## D.  Testimonial Evidence

### 1. James's Testimony

James was represented by counsel and testified at the administrative hearing.  Tr. 39-61. She described her most recent past job working in a transitional house for women in recovery. Tr. 42.  She had spent most of the time sitting; she also accompanied residents to the restrooms for urinalyses and prepared three course meals for dinner.  Tr. 43-44.

James stated that she is prevented from working because of chronic pain every day.  Tr. 48.  It never goes away and sometimes is an 8 or 9 on a scale of 1-10.  Tr. 48.  She has problems sitting for over an hour: her legs "sort of shifts where I can't hardly walk properly."  Tr. 49.  Pain shoots up through her leg due to her sciatic nerve on her left side.  Tr. 49.  She also sprained her right ankle and has a right "degenerated kneecap" that causes excruciating pain.  Tr. 48.  She can walk for "maybe about ten minutes without being in pain" and she can sit for about an hour before her pain shifts to another level.  Tr. 49.  She has chronic back pain and chronic knee pain; the left is worse than the right.  Tr. 49.  When asked if there is anything that makes the pain

better, James stated, "If I sit and then I reposition myself, so if I'm sitting in the position I am in now, if I was to elevate the knee for about a — I'm in physical therapy currently, and they showed me how to take a little of the stress off of the knees, and off of the back, so I don't need to be sitting for a long extensive time, or standing."  Tr. 49-50.  This alleviates the pain to about a 6/10 but does not make it go away.  Tr. 50.  Pain medications also help alleviate the pain a little bit, making it bearable when she is experiencing level 10 pain.  Tr. 51.

She lives alone in a house.  Tr. 41.  She used to own a car but did not have a driver's license; she was in the process of learning how to drive.  Tr. 48.  On a typical day, James gets out of bed about 6:30 a.m. and takes her medication; then she lies down until about 9:00.  Tr. 51.  She is up all times of night from back pain, knee pain, and chronic breathing problems.  Tr. 51.  At 9:00 a.m. she goes downstairs and has a cup of coffee and, after an hour, lies down again.  Tr. 51-52.  She gets back up around 1:00 and makes herself something to eat.  Tr. 52.  Then she lies on her couch and elevates her legs for about 15 minutes then goes back upstairs and lies down for the majority of the day.  Tr. 52.  She makes and eats dinner around 7:00 p.m. and cleans whatever dishes have accumulated for the day.  Tr. 53.  She does not do much cleaning, other than dishes and wiping down the bathroom.  Tr. 53.  She has difficulty going up and down the steps in her house and has to do it one foot, one step at a time.  Tr. 53.  She spends most of her time upstairs because that is where the only bathroom is.  Tr. 56.  Her niece helps with the cleaning, her friend takes her laundry to the laundromat (James will fold it afterwards), and her cousin mows the grass in her yard.  Tr. 53-54.  Her friend takes her grocery shopping and she has no problems shopping as long as she is in a motorized cart that the store provides.  Tr. 54.  She goes to church twice a week.  Tr. 55.  Her pastor's wife picks her up and she sits in a chair

during church and when her pain level starts increasing she will move to a long couch in the back to sit for a half hour and then she returns to her chair.  Tr. 55.

James has a nebulizer that she uses 4-5 times a week for her asthma and a CPAP machine that she uses for her sleep apnea.  Tr. 56-57.  Her Zoloft makes her a little bit drowsy and discombobulated.  Tr. 57.  She goes to Portage Path for counseling 2-3 times a month and sees the psychiatrist every 90 days.  Tr. 57.  She does not think counseling has helped because she is still depressed.  Tr. 58.  She has Post-Traumatic Stress Disorder from losing her adoptive mother and her birth mother in short succession.  Tr. 58.  She is in physical therapy for the third time; it helps relieve some of her problems for that day but then the problem is back the next day.  Tr. 58.

The longest period of time that James can do anything before she has to go and rest, such as when she is at church, is about an hour.  Tr. 59.  When she gets home, she gets something to drink then goes upstairs and lies down.  Tr. 59.  She can ride around in a motorized cart at a grocery store for about 30 minutes before she needs to go back home.  Tr. 60.  When she gets home, she puts away her groceries "and then I usually sit down because of the stance of me in the cart.  It does like a shift to my back."  Tr. 60.  The heaviest item she would lift is a five pounds because she never thought about lifting ten.  Tr. 59.  When asked if her doctors had come up with an explanation for her chronic pain, James replied that one doctor said it was her sciatic nerve, and everyone had noted that she puts more weight on her left knee because she has no "up and down range" and this is causing her to put more weight on her bad knee, which is causing her good knee to go bad.  Tr. 61.

### 2.  Vocational Expert's Testimony

14

Vocational Expert George Starosta ("VE") testified at the hearing.  Tr. 61-72.  The ALJ discussed with the VE James's past relevant work as a home health aide and claims clerk.  Tr. 62.  The ALJ asked the VE to determine whether a hypothetical individual of James's age, education and work experience could perform James's past jobs or any jobs in the regional or national economy if that person had the following characteristics: can perform light work; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; cannot climb ladders or scaffolds or be exposed to unprotected heights or moving mechanical parts; cannot operate a motor vehicle; and can have occasional exposure to weather, humidity, dust, odors, fumes, irritants, extreme cold, and extreme heat.  Tr. 62-63.  The VE testified that such a person could perform James's past work and could also perform work as a cashier (1.7 million national jobs), ticket taker (54,000 national jobs), and laundry folder (21,100 national jobs).  Tr. 63-64.

The ALJ asked the VE whether the hypothetical individual could perform any of the jobs he identified if the individual would have the following, additional limitations: could perform sedentary work and be limited to simple, routine tasks.  Tr. 64.  The VE answered that the previously identified jobs would be eliminated but that such an individual could perform work as a surveillance system monitor (291,000 national jobs); mail sort clerk (19,000 national jobs); and optical assembler (15,000 national jobs).  Tr. 64-65.

James's attorney pointed out that James would grid out of sedentary work on her 50th birthday and the ALJ agreed.  Tr. 65.  James's attorney then asked the VE whether he was aware that the Sixth Circuit Court of Appeals had found that the surveillance system monitor job identified by the VE does not exist in significant numbers in the national economy and the VE stated that he was not aware of that decision.  Tr. 66.  James's attorney asked when the DOT description had been written for that job and the VE answered that he believed it was written in

1977 and last updated in 1986.  Tr. 66.  The VE explained that the job has evolved significantly

since 1986 in that it is no longer restricted to just transportation or government facilities but it is

performed as video surveillance in offices, retail establishments, and at call centers.  Tr. 67.

James's attorney asked if these jobs would be semi-skilled and the VE responded that they would

still be unskilled.  Tr. 67.

James's attorney then asked the VE whether the first hypothetical individual described by

the ALJ could still perform light work if that person had an at-will sit/stand option.  Tr. 68.  The

VE answered that, assuming such an individual would not be off task when changing positions,

she could still perform light work.  Tr. 68.  James's attorney asked whether a person would be

off task if she would have to leave her work station for three to four minutes when she changed

position and that she would change position twice an hour, i.e., be off task for about 10-12% of

the time.  Tr. 69.  The VE answered that some employers may tolerate that, but, in his opinion,

he believed it would be a problem.  Tr. 69-70.  James's attorney asked if there would be jobs the

person could perform if she missed up to four days per month and the VE replied that, in his

opinion, that level of absenteeism would be unacceptable.  Tr. 70.

The ALJ asked the VE to confirm that the first hypothetical individual that he had

described could perform work with a sit/stand option if the individual would not be off task

while changing positions.  Tr. 70.  The VE stated that such an individual could not perform

James's past relevant work but could perform the jobs previously identified (cashier, ticket taker,

folder), but that the job numbers for cashier would be reduced to 850,000 national jobs.  Tr. 70-

71.  The ALJ asked the VE to verify that the numbers of jobs that he cited for the surveillance

system monitor position exist and the VE replied that he has done significant work studying the

numbers and that they do exist.  Tr. 71.  James's attorney asked if it was possible to receive a

copy of the VE's study and the VE testified that the study was based on his private research and was not published.  Tr. 72.

## II. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his July 7, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.  Tr. 20.

2.      The claimant has not engaged in substantial gainful activity since January 2, 2008, the alleged onset date.  Tr. 20.

3.      The claimant has the following severe impairments: obesity, asthma, hypertension, degenerative disc disease of the lumbar spine, degenerative joint disease of the bilateral knees, and sleep apnea.  Tr. 20.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 23.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she must be able to sit and stand at will, while remaining on task.  She can occasionally climb ramps and stairs, and never climb ladders[] and scaffolds.  She can occasionally balance, stoop, kneel, crouch, and crawl.  The clamant can never work at unprotected heights or with moving mechanical parts.  The claimant can never operate a motor vehicle, and can occasionally be exposed to weather, humidity, and wetness.  The claimant can have

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

occasional exposure to dusts, odors, fumes, and pulmonary irritants.  She can handle occasional exposure to extreme cold and extreme heat.  Tr. 23.

6.  The claimant is unable to perform any past relevant work.  Tr. 28.

7.  The claimant was born on February 22, 1965 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 28.

8.  The claimant has at least a high school education and is able to communicate in English.  Tr. 28.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 28.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 28.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2008, through the date of this decision.  Tr. 29.

## V. Parties' Arguments

James objects to the ALJ's decision on five grounds: (1) the ALJ did not properly evaluate James's obesity and related impairments at Step Three; (2) the ALJ did not articulate a valid reason at Step Two for finding that James did not have a severe psychological impairment; (3) the ALJ failed to articulate valid reasons for discounting the opinions of James's treating, examining, and reviewing physicians; (4) the ALJ did not properly evaluate James's credibility; and (5) the ALJ did not meet his burden at Step Five.  Doc. 15, p. 1.  In response, the Commissioner submits that the ALJ did not err at Steps Two, Three and Five; and he properly considered James's obesity, credibility, and the opinion evidence.  Doc. 17, pp. 7-25.

Many of James's arguments overlap; for example, she discusses the ALJ's treatment of the opinion of Dr. Prosperi, a state agency reviewer, in her section in which she challenges the ALJ's obesity determination at Step Three.  For convenience, the undersigned considers James's arguments in sequential order.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at Step Two

James argues that the ALJ erred at Step Two when he "did not articulate a valid reason ... for finding that James did not have a severe [psychological] impairment."  Doc. 15, p. 15.  She criticizes the ALJ's discussion of James's mental impairments and his conclusion that it was not severe.  Specifically, she identifies the ALJ's observation that James did not seek mental health treatment until late 2013, did not consistently take her medication, and primarily discussed her physical issues at counseling sessions.  Tr. 21.

James does not assert that the ALJ's statements are incorrect, just that there is other evidence that would support a finding that her impairment is severe. But the Court does not try the case *de novo*, nor resolve conflicts in evidence. *Garner*, 745 F.2d at 387. And, despite James's attempt to suggest that the treatment note from January 2014 is vague about when she did, in fact, run out of medication (Doc. 15, p. 16), the Court declines to engage in speculation as to what James meant when she stated, in January 2014, that she ran out of medication "a long time ago." Regardless of <u>when</u> James was referring to having run out of medication, the fact remains that James stated that she had run out of her medication, i.e., she either had not taken her medication or she did not keep up with refilling her prescriptions. This is non-compliance with medication. Moreover, as the ALJ remarked, treatment notes show that James also ran out of medication in April 2014 and August 2014. Tr. 21.

Next, James complains that the ALJ relied on the opinion of state agency reviewer Dr. Johnston, but that Dr. Johnston's opinion was dated January 15, 2014, before James's Portage Path mental health records had been submitted into the record. Doc. 15, p. 17. She states that this is reversible error. Id. The undersigned disagrees. First, although James started visiting Portage Path in November 2013, many of the records James cites are dated after January 2014. In other words, these treatment notes were not in the record because they didn't exist at the time, not because they hadn't yet been submitted. Regardless, the ALJ discussed James's treatment notes from Portage Path (Tr. 21-22), and it was not error for him to rely on Dr. Johnston's opinion, which did not consider the Portage Path treatment notes. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. Aug. 19, 2009) (rejecting an argument that the ALJ erred when he relied on a state agency reviewer's opinion that, in turn, was based on an incomplete record when the ALJ reviewed the complete record); *Helm v. Comm'r of Soc. Sec.*,

405 Fed. App'x 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record.  The opinions need only be 'supported by evidence in the case record.'") (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)).

Lastly, James argues that the ALJ erred when he gave "no weight" to therapist Tomoko Sherrod's opinion.  Doc. 15, p. 17.  She contends that the ALJ "should have considered the form" Sherrod filled out and asserts that the form was supported by Sherrod's counseling notes. Id.  But the ALJ did consider the form that Sherrod completed.  Tr. 21.  James does not contest the reasons that the ALJ gave for his assessment of Sherrod's opinion: that James was non-compliant with medications, her course of treatment was conservative, and Sherrod's assessed limitations were inconsistent with James's activities of daily living.  Tr. 21.  The ALJ also gave great weight to consultative examiner Dr. Rosenthal's opinion that James had no significant limitations.  Tr. 22.  In short, the ALJ's decision is supported by substantial evidence.  That James disagrees with the ALJ's conclusion is not grounds for reversing the ALJ's decision.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

### B. The ALJ did not err when considering James's obesity

#### 1. Obesity at Step Three

James argues that the ALJ erred at Step Three when he failed to evaluate her "obesity and related impairments."  Doc. 15, p. 13.  She asserts that the ALJ "disregarded any evidence"

indicating that James's obesity met or equaled a listing "based on her documented joint, back and breathing problems." Id., p. 14.

With respect to James's asthma and breathing issues, the ALJ considered Listings 3.03 and 3.09.[2] Listing 3.03 (Asthma) requires forced expiratory volume (FEV) scores and exacerbations or complications resulting in three hospitalizations (lasting at least 48 hours) within a 12-month period and at least 30 days apart. See 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 3.03. Listing 13.09 (Chronic pulmonary hypertension due to any cause) requires a "mean pulmonary artery pressure equal to or greater than 40 mm Hg as determined by cardiac catheterization while medically stable." Id. As the ALJ observed, James had no pulmonary testing and, although she sought emergency room treatment, this treatment was for sinus infections and congestion; she received an inhaler; thereafter there was no evidence of acute asthma exacerbation; and she reported having occasional shortness of breath and some wheezing but was "otherwise fine." Tr. 26.

The ALJ also considered Listings 1.02 (Major dysfunction of a joint(s) (due to any cause)) and 1.04 (Disorders of the spine). Tr. 23. James does not show that she meets or equals either of these listings, or that the combination of obesity and her physical impairments causes her to equal any of these listings. She points to no evidence that she has an inability to ambulate effectively, as required by Listing 1.02, or that she has nerve root compression with motor loss or other, diagnostic findings, as required by Listing 1.04. See SSR 02-1p, 2002 WL 34686281, at *5 ("We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of

---

[2] Although the ALJ wrote that he considered Listing 3.10, that listing is not a named listing. The undersigned assumes that the ALJ meant Listing 3.09 (Chronic pulmonary hypertension due to any cause), given that he referenced pulmonary testing in his decision.

coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.").  *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." (emphasis in original)).

### 2. Obesity in the ALJ's RFC assessment

James also complains that the ALJ "disregarded any evidence which would have limited James to a sedentary level of exertion," including "observations" as to the effect of James's obesity on her knees and breathing.  Doc. 15, p. 14; Doc. 18, p. 4.  This appears to be a challenge to the ALJ's RFC that James could perform work at the light level of exertion.  James cites twelve treatment notes in support of her argument.

Of the twelve record citations that James provides supporting "observations" about the effect of her obesity on her knees and breathing, seven of them are not observations about the effect of James's obesity on her knees or breathing but, rather, straight observations about James's musculoskeletal problems, Tr. 366, 367, 434, 503, 684, 690, or sleep apnea, Tr. 564. Two of the remaining treatment notes are observations about the effect of James's obesity on her sleep apnea, Tr. 434, 684, but James's sleep apnea was controlled with the use of a CPAP machine, as the ALJ observed (Tr. 26).  One treatment note, dated August 26, 2014, assessed "extreme obesity with alveolar hypoventilation," but the same treatment note also stated that James had occasional shortness of breath and some wheezing, that she felt good on Albuterol, and was "otherwise fine," which the ALJ remarked upon.  Tr. 26, 751.  These treatment notes are

not evidence that James's obesity in combination with her other impairment meets or equals a listing, nor do they suffice as evidence that the ALJ's RFC assessment is erroneous.[3]

The two remaining treatment notes cited by James include observations about the effect of James's obesity on her impairments.  Tr. 504, 754.  One is the opinion of Dr. Gaul, who stated,

> At this time, the claimant has chronic pain and asthma, likely exacerbated by her weight, which has caused hypertension and sleep apnea (use of C-PAP).  It would be very beneficial for her to lose weight and then be more active.  The activity would probably help with her pain and all of her other issues.

Tr. 504.  Dr. Gaul's opinion about James's obesity is with respect to her hypertension and sleep apnea, which are controlled.  That James's other physical problems would be helped by losing weight does not appear to be disputed; nor does Dr. Gaul's opinion describe how, precisely, James's obesity impacts her physical impairments.  Dr. Gaul's own testing at the consultative exam showed normal muscle and range of motion results, as the ALJ noted.  Tr. 27, 505-508. The last treatment note identified by James describes the history of James's present illness and states, "Morbid Obesity: is developing multiple complication[s] such as Hypoventilation, OA of multiple joint[s.]"  Tr. 751.  But the ALJ considered the effect of James's obesity upon her impairments:

> Pursuant to [SSR] 02-1p, I considered the effects of the claimant's obesity when formulating [her] residual functional capacity.  The claimant's obesity is likely to have adverse impact upon her co-existing impairments, particularly her degenerative disc disease and knee problems.  She may have more pain and limitation than might be expected due to the additional weight on her body.  These considerations have been taken into account in formulating the claimant's residual functional capacity.

Tr. 27.

---

[3]  The ALJ's RFC assessment limited James to occasional exposure to weather, humidity, wetness, dusts, odors, fumes, pulmonary irritants, extreme cold and extreme heat.  Tr. 23.

James argues that the ALJ erroneously favored the July 2013 opinion of the first state agency reviewer, Dr. Torello, over the January 2014 opinion of the second state agency reviewer, Dr. Prosperi.  Doc. 15, p. 14.  Dr. Torello opined that James could perform light work (stand and walk 6 hours a day) and Dr. Prosperi opined that James could perform sedentary work (stand and walk 4 hours a day).  Dr. Prosperi wrote that Dr. Gaul's opinion, that James could perform sedentary work, "appear[s] reasonable considering [James's] significant morbid obesity and chronic pain complaints as well as functional limitations."  Tr. 121.  The ALJ favored Dr. Torello's opinion over Dr. Prosperi's opinion with respect to the number of hours standing and walking because the record did not show that James needed a cane, she did not have surgeries or injections, her diagnostic testing was mostly unremarkable, and she regularly walked to her destinations.  Tr. 27.

James first argues that Dr. Prosperi's opinion was better because it was based on additional records, including Dr. Gaul's opinion that James "would be able to do any job that would be mostly sedentary but she would be able to get up and move around and do things as needed between hours of sitting."  Tr. 504.  But the ALJ discounted Dr. Gaul's opinion, finding it vague ("It is unclear what 'mostly sedentary' entails") and noting that Dr. Gaul's examination findings were normal and did not support her conclusion of a "mostly sedentary" work limitation.  Tr. 27.

James next objects to the ALJ's finding that she regularly walked to her destinations, accusing the ALJ of "misstat[ing] the testimony" because there was no testimony by James at the hearing about walking places and, in fact, James stated that when she went grocery shopping she used a "drive cart" provided by the store.  Doc. 18, p. 3.  In his decision, the ALJ stated,

> ....Further, the claimant has not had a car for much of the relevant period, and had to walk to her destinations (Testimony).

Tr. 27.  James testified that she had had a car and that she had been in the process of trying to learn how to drive, but that she did not have a license.  Tr. 48.  The ALJ's citation to "Testimony," therefore, is an accurate citation.  While true that James did not testify that she walked to her destinations, she did not testify that she did not walk to her destinations, and a treatment note in the record reads that James stated that she was "Walking since she doesn't have a car anymore," which the ALJ referenced elsewhere in his decision.  Tr. 25, 347.  The undersigned also observes that the record shows that James reported "brisk walking daily" in March 2012 and reported that she could walk and stand for about an hour in April 2014 before having to rest.  Tr. 684, 379.  In short, James describes her dissatisfaction with the ALJ's conclusions but does not identify an error.  Accordingly, the ALJ's decision must be affirmed.  *See Jones*, 336 F.3d at 477.

### C. The ALJ did not err with respect to the opinion evidence

#### 1. Treating physician

James argues that the ALJ failed to articulate valid reasons for discounting the opinions of James's treating, reviewing and examining physicians.  Doc. 15, p. 17.  She starts with the "questionnaire completed by the Internal Medicine Center of Akron in January 2013" and describes that questionnaire as James's "treating physician not[ing] that [James] could only tolerate moving and functioning up to three hours," which, James asserts, would either preclude all work or, at a minimum, any work other than sedentary.  Id.  She alleges that the ALJ failed to mention this questionnaire.  Id.  This allegation is false.  The ALJ discussed the questionnaire as follows,

> The claimant's doctor at the Internal Medicine Center of Akron opined that the claimant can only move and be able to function for up to three hours, but after that, could not work due to pain (Exhibit 3F/2).  I afford this opinion no weight.  It is vague, and does not

specify what it means to only be able to function for three hours.  Further, the diagnostic testing, the objective findings upon examination, and the conservative course of treatment do not support it.

Tr. 26.  Beyond her erroneous statement that the ALJ failed to consider the undated and unsigned questionnaire filled out by an individual representing the Internal Medicine Center of Akron, James does not articulate an error that the ALJ made in giving no weight to the opinion.  The ALJ did not err, as he accurately characterized the opinion as "vague," considered whether the opinion was supported by diagnostic testing and objective examination findings in the record, and remarked that the treatment James had received was conservative.  *See Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) ("An ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record"; if an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the reason for the weight); 20 C.F.R. § 404.1527(c)(2).

### 2. Consultative Examiner Dr. Gaul

James argues, "The ALJ erred when he stated that [Dr. Gaul's opinion] was inconsistent with the findings made during the examination."  Doc. 15, p. 19.  The undersigned disagrees.  Dr. Gaul opined that James could perform work that is "mostly sedentary" but would need to "get up and move around and do things as needed between hours of sitting."  Tr. 504.  The ALJ's statement that this opinion is inconsistent with the normal findings by Dr. Gaul (that James had full, normal range of motion and/or full, normal strength in her shoulders, elbows, wrists, fingers, hips, knees, ankles, feet, big toes, cervical spine, and dorsolumbar spine, Tr. 503, 505-508) is an accurate statement.  James argues that Dr. Gaul's finding that James weighed 304 pounds on the

examination date is not a normal finding and "was stated as the basis for Dr. Gaul's opinion." Doc. 15, p. 19.  But the fact that James was obese does not describe a functional limitation and, as the ALJ correctly noted, James's manual muscle testing and range of motion were normal, indicating that James's obesity did not interfere with her functional abilities to the extent described by Dr. Gaul.  Moreover, James does not show that the ALJ's RFC, which included a sit/stand at will option, does not account for limitations caused by her impairments.

### 3. State agency reviewing physicians

The undersigned discussed James's objections to the ALJ's treatment of the opinions by the state agency reviewing physicians Drs. Torello and Prosperi above in the section regarding James's obesity.

### D. The ALJ did not err in his credibility determination

James argues that the ALJ did not properly evaluate her credibility.  Doc. 15, p. 20.  She asserts that, despite initially stating that James's statements are not entirely credible for the reasons explained in his decision, the ALJ "never discussed her credibility again."  Doc. 15, p. 21.  The undersigned disagrees.  After summarizing James's testimony (her chronic pain, inability to sit for long periods, the need to shift positions, not sleeping well due to pain), the ALJ stated that James's allegations concerning the intensity, persistence and limiting effects were not entirely credible.  Tr. 24.  He detailed the chronological history of her musculoskeletal impairments, including her pain complaints, and remarked upon her mostly normal examination findings, x-ray, MRI, and lab work results, which did not support her allegations, and accurately set forth her abnormal examination findings and x-ray results which, he stated, supported some degree of limitation.  Tr. 24-26.  He also observed that she had significant gaps in treatment, which he found inconsistent with her allegations regarding her pain and limitations, and noted

that the treatment that she had had was conservative, also cutting against her allegations regarding the severity of her pain.  Tr. 24-25.  James argues that the ALJ's conclusion "is not true."  Doc. 15, p. 21.  She does not describe an error; she disagrees with his assessment of the evidence.  This is not cause for reversal.  *Jones*, 336 F.3d at 477.

### E. The ALJ did not fail to meet his burden at Step Five

James argues that the ALJ failed to meet his burden to provide evidence regarding work that exists in the national economy that James can perform.  Doc. 15, p. 22.  She asserts that the ALJ should have found James capable of only sedentary work and points out that, under the Medical Vocational Grid Rule 201.14, she should have been found disabled.  Id., p. 24.  In support, she relies on her other arguments, discussed above, that James should have been limited to sedentary work.  Because these arguments are unavailing, James's Step Five challenge is also unavailing.  She describes no error regarding the jobs identified by the VE in response to the ALJ's first hypothetical, including a sit/stand at will option, which he relied upon for his decision.  She does allege an error as to the VE's identification of a job in answer to the ALJ's second hypothetical (Doc. 15, p. 23), but the ALJ did not adopt that hypothetical or the VE's response.  So even if the VE's testimony was insufficient, the ALJ did not rely on it.  James's Step Five challenge fails.

## VII. Conclusion and Recommendation

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: June 27, 2017

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)